STATE OF IOWA, Plaintiff, Appellee, v. J. M. CONWAY, Defendant, Appellant.

No. 42823.

APRIL 2, 1935.

Rhinehart & McLaughlin and France, Cash & Healy, for appellant.

Edward L. O'Connor, Attorney-general, Clair E. Hamilton, Assistant Attorney-general, and Marvin C. Levsen, County Attorney, for appellee.

HAMILTON, J.—The defendant is charged by a county attorney's information with the crime of embezzlement by public officer. He was tried, and a verdict of guilty was returned by the jury, and judgment pronounced thereon by the court. The usual motions to set aside verdict and for a new trial and motion in arrest of judgment were made by the defendant and overruled by the court. Several grounds of error are cited in appellant's brief, but they all have to do with two propositions: (1) Was the defendant a public officer? and (2) if he was such, was proper demand made on him by the person entitled to receive the money claimed to have been embezzled?

The facts necessary to a correct understanding of the legal propositions involved are these: The defendant for a number of years prior to September 20, 1926, had been holding the office of chief clerk in the men's reformatory at Anamosa, Iowa. On or about this date two members of the state board of control, Mr. McColl and Mr. Strief, visited this institution, and, at what might be termed an informal meeting of these two members of the board with the warden of the institution, the matter of the necessity of additional help in connection with the management of the industries which were being operated at the reformatory was taken up, talked over, and considered by them. As a result of this meeting, it is claimed by the state, the office of auditor and clerk of industries of the men's reformatory was created, and the warden was directed to appoint such officer. It is not claimed that any formal meeting of the board was held, with a secretary present to record the proceedings, or that any motions were made and seconded and a formal ballot taken thereon and minutes taken of the proceedings in the regular way; but it is claimed that, with a majority of the

members of the board present, they did, in fact, have a meeting of the board and unanimously designated, created, or brought into being a new office. This claim of the state is borne out by the testimony of those who were present at this meeting.

There is no evidence to contradict the testimony of the state, the defendant relying entirely upon the fact that there is no record of such action, and that it cannot be established by parol. The defendant also claims that the testimony does not bear out the state's theory that there was in fact a meeting of the board of control, and that the action of two members was not such a meeting as the law contemplates, and the first and only really serious legal proposition raised by the defendant is in reference to this question.

The law with reference to the government of state institutions is found in chapter 167 of the 1931 Code of Iowa (section 3287 et seq.), and the state institutions listed in this chapter, including the men's reformatory at Anamosa, are placed under the control of the board of control, and such board is given "full power to contract for, manage, control, and govern, subject only to the limitations imposed by law" (section 3287) all such state institutions. Section 3290 provides:

"The board shall prescribe such rules, not inconsistent with law, as it may deem necessary for the discharge of its duties, the management of each of said institutions, * * *. In the discharge of its duties and in the enforcement of its rules it may require any of its appointees to perform duties in addition to those required by statute."

Section 3292 provides:

"The board shall appoint a superintendent, warden, or other chief executive officer of each institution under its control who shall have the immediate custody and control, subject to the orders of the board, of all property used in connection with the institution."

Section 3293 provides:

"The board shall determine the number and compensation of subordinate officers and employees for each institution. Such officers and employees shall be appointed and discharged by the chief executive officer."

Section 3295 provides:

"The board shall require its secretary and each officer and employee of said board, and of every institution under its control who may be charged with the custody or control of any money or property belonging to the state, to give an official bond, properly conditioned, and signed by sufficient sureties, in a sum to be fixed by the board, which bond shall be approved by the board, and filed in the office of secretary of state. It may require bonds of other officers and employees not enumerated above."

Section 3296 provides:

"The board shall, annually, with the written approval of the governor, fix the annual or monthly salaries of all officers and employees for the year beginning July first of said year, except such salaries as are fixed by the general assembly." etc.

It will be observed from the foregoing statutory provisions that there are no fixed statutory rules or regulations governing the board as to form and manner or time and place of holding its meetings for the transaction of its business. Matters of this kind are left in the absolute control of the board. The board consists of three members, two of which would constitute a quorum to transact business. There is nothing in the statute forbidding an impromptu meeting of the board and nothing in the law forbidding such impromptu meeting from taking place at any of the state institutions. We think it can fairly be said under the testimony of the warden and Mr. McColl, one of the members of the board, who was present, that such an impromptu meeting was in fact held by the board at or about the date of September 20, 1926, at the men's reformatory at Anamosa, and that at that meeting the matter of additional help in connection with the management of the industries was considered; that the two members of the board present at this meeting agreed and decided that they should have an office specially for the purpose of looking after the industries of the men's reformatory, and that they created and designated such office under the title of "Auditor and Clerk of Industries" at this meeting, and directed the warden to appoint some one to fill such office. This was testified to by both McColl and the warden, who were present at the meeting. There being no record made of the proceedings, oral testimony was admissible for the purpose of showing what was done.

It must be borne in mind that this action of the board was taken nearly eight years before the filing of the information in this

case. Nothing was reduced to writing, and, in the very nature of things, oral testimony as to what took place, standing alone, would not be very satisfactory, but this oral testimony is corroborated by the following record evidence shown by the abstract: On the 20th day of September, 1926, the warden wrote a letter to the board in which he said:

"Pursuant to the instructions given me by Senator McColl and Mr. Strief while here on their recent visit, I have today appointed J. M. Conway to the *new position of auditor and clerk of industries.* * * * Please advise the amount of bond you wish Mr. Conway to give, so he can forward bond at once."

Under date of October 6, 1926, the records of the board of control recite:

"Bond of James M. Conway, Auditor and Clerk of Industries, Men's Reformatory, in the sum of $10,000.00 with National Surety Company as security approved and ordered placed on file with Secretary of State."

This record was signed by the chairman and secretary of the board. At the time of the trial of this case, this bond was found among the records and files in the office of the secretary of state, as provided by law. It bears date of September 28, 1926, and designates the office for which the principal named in the bond was appointed as "Auditor and Clerk of Industries, Men's Reformatory, Anamosa, Iowa," and shows his appointment was for an indefinite term from the 20th day of September, 1926, until his successor is appointed and qualified. The bond bears the signature of James M. Conway and the National Surety Company, and bears the stamp of approval of the board of control under date of October 4, 1926. On the back of the bond is the usual form of oath of office which every public officer under our statutes is required to take and subscribe, and this oath is sworn to under date of September 30, 1926, by James M. Conway, in which we find this language:

"I will faithfully, etc., discharge the duties of the office of Auditor and Clerk of Industries to which I have been appointed," etc.

The evidence shows that this defendant entered upon the discharge of his duties, and from that time forth designated himself

in all the papers and proceedings as "Auditor and Clerk of Industries." Monthly reports were made by him of the amount of money received and the disposition made thereof, and a copy of this report sent to the treasurer of state with a remittance of the monthly balance, and on each and all of these reports his office is designated as "Auditor and Clerk of Industries" and his official signature is that of auditor and clerk of industries. The evidence shows that it was his duty, and that he did in fact collect the money that came in and was paid out in connection with the industries of this institution, and that this continued until the end of the year 1931.

The record of the fixing of the annual salary of all officers of state institutions, required to be made by the board and approved by the governor, lists and designates this office as auditor and clerk of industries, and the salary is fixed at $200 a month. These reports are signed by the chairman and secretary of the board and bear the approval and signature of the Governor of the state. This evidence all points to the fact that such office was in fact created and established by the board, and that the salary was fixed at $200 a month. The office which this defendant held immediately prior to his appointment as auditor and clerk of industries was that of chief clerk, an office created by statute, the salary of which was $150 a month. His appointment to this new office was, therefore, an elevation or promotion, and was entitled to be classified at least equal to, if not in a higher class than, that of chief clerk. The evidence shows that these two offices occupied the same room.

It is true, as shown by the evidence, that there were no formal prescribed duties, except the testimony shows that the details of fixing and prescribing the duties of this office were left to the chief accountant of the board, and the evidence discloses that there was correspondence between the chief accountant and the occupant of this office with reference to such duties. Furthermore, the duties required of such an officer necessarily inhere in and pertain to the administration of the office itself, and, in addition thereto, the statute, section 3330 of the Code, provides:

"The chief executive officer of each institution shall, on the first day of each month, account to the board for all state funds received during the preceding month, and, at said time, remit the same to the treasurer of state."

The chief executive officer was the warden, but, when this new office of auditor and clerk of industries was created, it imposed by implication upon such auditor the same duties and responsibility with reference to funds received by him in connection with such industries.

While this court does not wish to place its stamp of approval upon the "loose-end" methods which the evidence in this case discloses in the manner of transacting the business of the board of control at the time in question, yet, we think, and therefore hold, that there is sufficient evidence to warrant the court in finding as a matter of law that the office of auditor and clerk was in fact created, and that J. M. Conway, the defendant, was appointed to fill this position and was a public officer within the meaning of the statute under which the information in this case was found.

It would serve no useful purpose to review the holdings of the various courts as to what constitutes a public office. Our court went into this matter quite thoroughly in the case of State v. Spaulding, 102 Iowa, p. 639, 72 N. W. 288, 290, wherein the authorities are fully reviewed on this subject, and it will be found by an examination of these authorities that the definition of a public office varies very widely in different jurisdictions. A definition which we think is quite appropriate to this case is found in Commonwealth v. Evans, 74 Pa. St. 124, wherein a public officer is defined as follows:

"All persons who, by authority of law, are intrusted with the receipt of public moneys, through whose hands money due to the public, or belonging to it, passes on its way to the public treasury, must be so considered [as public officers], by whatever name or title they may be designated in the law authorizing their appointment, and whether the service be special or general, transient or permanent."

And in the Spaulding case, supra, Chief Justice Kinne, speaking for the court, after considering all authorities, laid down the following rules for determining whether one is a public officer within the contemplation of our statute relating to embezzlement of such officer:

"(1) The office itself must be created by the constitution of the state, or authorized by statute. (2) If authorized by statute, its creation may be by direct legislative act; or the law making power, when not inhibited by the constitution or public policy from so

doing, may confer the power of creating an office upon official boards or commissions which are themselves created by the legislature, when such office is necessary to the due and proper exercise of the powers conferred upon them, and the rightful discharge of duties enjoined. (3) A position so created by the constitution, or by direct act of the legislature, or by a board of commissions duly authorized so to do, in a proper case, by the legislature, is a public office. (4) To constitute one a public officer, at least within the purview of the criminal law, so that he may be liable for the misappropriation of the public funds, his appointment must not only have been made or authorized as above stated, but his duties must either be pre-scribed by the constitution or the statutes of the state, or necessarily inhere in and pertain to the administration of the office itself. (5) In any event the duties of the position must embrace the exercise of public powers or trusts; that is, there must be a delegation to the individual of some of the sovereign functions of government, to be exercised by him for the benefit of the public. (6) The follow-ing, among other requirements, are usually, though not necessarily attached to a public office: (a) An oath of office; (b) salary or fees; (c) a fixed term of duration or continuance."

That the board of control was authorized by the legislature to make and create this office is plainly within the provisions of sec-tion 3293 of the Code. The argument of counsel for defendant is far-fetched and not very persuasive, wherein they contend that this defendant was a mere employee, and that this office did not rise to the dignity of a public office in view of the fact that he was in-trusted with the handling of all funds, that he personally had charge of all moneys that came in and were paid out under the orders of the board of control, and made the monthly reports in connection with the industries to the board of control and to the state treasurer, and that this continued from the date of his appointment until the first day of January, 1932.

The chief accountant of the board of control, who had been such accountant for more than twenty years, testified that the de-fendant, as auditor and clerk of industries, had charge of the in-dustrial accounting, the collecting of cash and accounting for the cash; that, as accountant, he frequently made trips to the various institutions, and, when he visited the men's reformatory to check over the books to reconcile the cash with the reports, that he always went to Mr. Conway, the defendant; that he had the cash locked in

the cash drawer, and he brought it out and it was counted by the accountant. The evidence further shows that practically all the entries in the cash records during all this time were made in the handwriting of this defendant, and that, as to all the entries made by other employees, there was no discrepancy in any of such items.

The second major proposition urged by the defendant in his assignment of errors relates to the demand made upon the defendant for an accounting. It is the contention of counsel for defendant that the duty of making the monthly reports and accounting is placed upon the warden, the chief officer, and that therefore the demand should necessarily come from the warden. The information charges that demand for payment was made by W. H. Frazer, warden and chief executive officer of the men's reformatory, and by Leo J. Wegman, treasurer of the state of Iowa, they being the person or persons entitled to receive said money. On motion of the defendant, the state was required to elect upon which of the demands made upon defendant it would stand, and the state elected to stand upon the demand made by Leo J. Wegman as treasurer of the state of Iowa. That demand was made by the treasurer is fully proven and is not controverted by the defendant, but counsel strenuously insist that he was not the proper officer to make the demand. The necessity for making demand of the officer charged with the embezzlement is found in section 13029 of the Code, which recites:

"And in case he fails or neglects to account therefor upon demand of the person entitled thereto."

Section 3330 requires:

"The chief executive officer of each institution shall, on the first day of each month, account to the board for all state funds received during the preceding month, and, at said time, remit the same to the treasurer of state."

The embezzlement upon which the state elected to stand was committed during the month of June, 1931, and is shown by the report dated June 30, 1931. On the first day of July, 1931, the money in the hands of this defendant, as shown by his monthly report for the month of June previous, was payable to the state treasurer, and the officer having charge of making the report and making the remittance is charged with making it to the treasurer of state under section 3330 of the Code. This new office created placed this duty upon the auditor and clerk of industries, and he assumed

that duty during all the time that he was such officer and made the reports, one of which was mailed to the board of control, and another of which was mailed with the remittance to the state treasurer.

The cases of State v. McKinney, 130 Iowa 370, 106 N. W. 931, and State v. Berg, 200 Iowa 627, 204 N. W. 441 are not applicable to the situation in this case. It is true that section 3330 places upon the warden, the chief officer, the duty of accounting to the board for all state funds received during the preceding month and at said time of remitting the same to the treasurer of state. But this duty only referred to funds which came into the hands of the warden. The money embezzled in this case never reached the hands of the warden. The warden never made the report for June, 1931. It was made by this defendant. There is no provision in the statute for the outgoing warden to turn over the cash in his hands to his successor, as was the case in State v. McKinney, supra. The successor of the then warden is not entitled to receive the money of his predecessor. That money is payable direct to the state treasurer as the officer entitled to receive it, and, whether he was entitled to receive it from the warden or from the auditor and clerk of industries, he was most surely entitled to receive it. He is the only officer named in the statute who is entitled to receive it. Therefore it was proper that the demand should come from the state treasurer.

The errors assigned by the defendant with reference to the overruling of his motion to direct a verdict and his motion for new trial and in arrest of judgment, and his complaint of the refusal of the court to give certain requested instructions and of the giving of certain instructions by the court, are all based upon and have to do with the two assignments of error which we have already considered, and the conclusion we have reached with reference to these two propositions disposes of all other assignments of error urged by the defendant. That the funds were embezzled by the defendant admits of no question. We have examined the entire record, and find that the defendant has had a fair and impartial trial, and that the evidence warranted the jury in finding him guilty as charged in the information, and that the court submitted the case to the jury under proper instructions, and, finding no reversible error, it necessarily follows that the judgment of the trial court should be, and it is hereby, affirmed.—Affirmed.

ANDERSON, C. J., and KINTZINGER, DONEGAN, PARSONS, and RICHARDS, JJ., concur.